UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JUAN ROCHA

    Defendant.

No. 09 CR 669-10
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

### I. Defendant's Motion

In the overarching case, several men are charged with drug conspiracy offenses. One of them, Juan Rocha, was arrested for a different offense, an effort to obtain, by credit card fraud, some construction materials from Home Depot located at Armitage and Cicero in Chicago. Rocha seeks suppression of any evidence obtained from him after his arrest.[1] He argues there was no probable cause for arrest.

The Chicago police officers who arrested Rocha had no personal knowledge of any facts establishing probable cause. They relied on the word of a security employee of Home Depot who had some personal knowledge of these facts[2] and a good deal of information received from

---

[1] Police allegedly recovered $5800 in cash and a lease agreement for a home in Justice, Illinois. A dog sniffed and alerted on the cash, and Rocha answered questions about the lease agreement.

[2] The personal knowledge was acquired from a Home Depot store video of a prior pick up of goods for which a credit card was improperly used. What she observed on the video was the basis for her identification of suspect persons to police.

personnel at Home Depot's corporate loss prevention division. Rocha argues that the police were not entitled to rely upon the word of the security employee in the circumstances here.

## II. The Legal Background

There is some history behind the arguments here. For many years the Supreme Court adopted a step-by-step rule to determine whether police had probable cause based on information from a third person. A court would determine the validity of the informant's conclusion that there was a crime and, if that was so, the court would determine whether the person speaking to police was credible or reliable. The order in which these questions would be answered did not matter. This approach was, in time, referred to as the *Aguilar-Spinelli* test.[3]

The lower courts developed a series of sub-tests to aid in the application of *Aguilar-Spinelli*. Some of the most elaborate were tests for determining credibility. Separate evaluation rules applied to confidential informants who received personal benefits from police in exchange for their information, to confidential informants who did not receive benefits, to ordinary citizens who spontaneously reported offenses that had just occurred in their presence, to persons who reported offenses and identified themselves to the police, to persons whose information was a declaration against their own interest, to persons who the police officers knew to be upstanding members of the community and other police officers from the same or different departments. This list may not be exhaustive.

The administration of *Aguilar-Spinelli* was well delineated by Judge Charles Moylan, a nationally recognized and influential authority on Fourth Amendment questions. *See, e.g.,*

---

[3]The name is derived from *Aguilar v. Texas,* 378 U.S. 108 (1964) and *Spinelli v United States,* 393 U.S. 410 (1969).

*Stanley v. State,* 313 A.2d 847 (Md. Ct. Spec. App. 1974); *see also* Charles Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer*, 25 Mercer L.Rev. 741 (1974). His writing accurately described a highly sophisticated itellectualization of the "two pronged" standard of probable cause review. Judge Moylan neither attacked nor defended the standard. He described it accurately. The decision of the Supreme Court to abandon the "two-pronged test" may be viewed as a reaction to the elaborate nature of the probable cause analysis reflected in *Stanley v. State. See generally* Alexander P. Woolcott, *Recent Development: Abandonment of the Two-Pronged* Aguilar-Spinelli *Test:* Illinois v. Gates, 70 Cornell L. Rev. 316 (1985).

*Illinois v. Gates*, 462 U.S. 213 (1983) disapproved the "two-pronged test", holding that "probable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons." *Id.* at 232 (quotation omitted). The *Gates* Court noted specifically that the "two-pronged test" directs analysis into two largely independent channels–the informant's "veracity" or "reliability" and "his basis of knowledge." *Id.* at 233. The Court stated that such concepts "are better understood as relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." *Id.* "Totality of circumstances" now reigns. *Id.*

**III. The Facts**

In an evidentiary hearing on the motion to suppress, I heard testimony from both the Home Depot loss prevention manager and from Chicago Police. This statement of facts is based on that testimony.

Damires Cortes is and has been employed by retail establishments to work in asset protection. At the time of hearing she works for Target to "catch shoplifters." At the time of the incident she worked at Home Depot, her employer for about 3 years. She did asset protection at Cub Foods for 4 years. Throughout her career she received training in asset protection, currently studies criminal justice in school and hopes for a career in law enforcement.

Her involvement in this case started when she was assigned to look into an order that had been placed at a different Home Depot and paid for with a suspect credit card. By the time the assignment had been made the order had already been picked up–an order for power tools and contracting supplies of a value of thousands of dollars.

Cortes subsequently looked at the surveillance video of the pick up and saw two Hispanic males (one tall, bald and stocky and the other shorter and slim) and an African-American male. She also asked Home Depot's investigation team to look into the credit card and received a report that the account was legitimate but the account holder had not authorized any order for the materials recently purchased. Nor had he authorized several other orders placed "throughout Illinois" and another state. There was one pending order in Chicago at the Home Depot at Armitage and Cicero. Cortes confirmed with the asset protection manager there that the order was still pending.

Cortes went to that Home Depot on November 29, 2007 (not her usual place of work at Home Depot) and spoke again with that store's asset protection manager who reported that individuals had attempted to pick up the order yesterday evening. There was video of that attempt from November 28 and Cortes reviewed it (as did I later at the hearing). She recognized the tall, bald and stocky Hispanic individual as the same one in the videotape of the other pick-up. There were two carts of goods next to the man and some of those goods were recognizable as DeWalt tools, the kind of products to be picked up on the following day, November 29th.

After seeing this she called the police and told them what she knew.

When someone arrived to pick up the order, she called for police. When the police appeared she reported someone was there to pick up the order. She moved to a spot where she could observe the persons picking up the goods and recognized both of the Hispanic males who had picked up the fraudulent order at the earlier store. Both Cortes and the individuals are visible in the surveillance video. Cortes saw one of the men sign for the goods and look at the order list. She used her cell phone to summon the police officers. She reported the location and action of the individuals with the order. Cortes was unable to recall all of what she said to the officers or to the detective who later interviewed her. She had summoned police for assistance in similar situations over a hundred times in Chicago and Evanston.

Cortes recalled - and the video seems to show - the arrest was made while both individuals were in the store.

Joseph Deferville was one of the Chicago police officers at the Home Depot called by Cortes. Around 2:30 p.m. on November 29th, he arrested Defendant Rocha, who was shorter and slim, and another man, Thorn, who was the tall, bald, stocky man. Deferville had been at the

5

Home Depot store earlier in the day, and met with Cortes, whom he had not known before the 29th. At that time, according to Deferville,

> She related that an order had been placed at that store 1919 North Cicero and the credit card account number that was associated with that order was believed to be fraudulent...a corporate account...Alpha Builders...she was in communication with the corporate office for loss prevention and they alerted her to that and then that's how we got involved and that the account was also used at a different Home Depot in the Chicagoland area also for a purchase [which] was fraudulent.

Cortes told the officer that there had been an attempt the previous day to pick up the order. The attempt was made by three men, whom "she described...as two male blacks and one male hispanic." She said the three men could not pick up the order because it was too late to pull the list from stock. They were advised to pick up the next day–the 29th. They also asked for additional items to be purchased all in excess of $3000 above the original order bringing the total to more than $8000. She related that the prior order at a different store, the order that was picked up, exceeded $10,000. That order, Cortes added, was taken by two people, a white male and a male Hispanic.

Officer Deferville left the store after this interview and returned when Ms. Cortes contacted him to say the two individuals in question were there to pick up the order. The officer went back to the store where Ms. Cortes said she would signal the officers when the transaction had been completed; i.e., the merchandise signed for. When that happened, Ms. Cortes called in the police by telephone.

Deferville walked into the store and saw two individuals standing next to a dolly or flatbed with several items on it. He saw Rocha apparently looking over a "manifest list of items that he had, that he just purchased." The other man was standing adjacent to the cart looking,

6

with Rocha, at a common list of items. The officer believed that these two men matched the description Ms. Cortes had given him concerning the earlier Home Depot pick up on the south side of Chicago. At that point in time he arrested Rocha and the other man because he and his fellow officer "believed that probable cause existed to place them in custody for fraudulent use of a credit card."

The officer did not independently remember these events, he had made many arrests and reviewed his reports so he could testify; the crime itself was not so memorable as to stick in his mind.

During cross examination, the officer conceded that his reports were inconsistent in several ways with his testimony, to wit, (1) his arrest report said Rocha was positively identified by Ms. Cortes as the person who signed the receipt for the items picked up while his testimony was that Ms. Cortes did not say who signed it; (2) his arrest report states that Ms. Cortes said that Rocha was accompanied by another man and that man signed a receipt, while his testimony was that she did not say this.

The officer testified on cross that he saw Rocha in the store with paperwork in his hand and arrested him without verifying that the paperwork was from Home Depot and without a signal from Ms. Cortes that these two were the men she was concerned about. His decision was based on the description he was given earlier so that he knew what he was looking for. The description he received was one male white and one male Hispanic. In fact, both men are Hispanic.

Officer Deferville had two conversations with Ms. Cortes. The first was "quite a while...almost go[ing] into hours because we weren't sure when they were supposed to come and

7

pick up merchandise." According to the officer, Ms. Cortes "presented herself as very thorough to understanding what exactly corporate had disseminated to her as well as what she was telling us." He described her account as "clear" and "coherent." She did not appear to be nervous. On the second occasion when they came back to the store, she appeared alert and "very organized." There is another conflict between Ms. Cortes and Officer Deferville. He recalled her saying that a prior incident involved one white male and one Hispanic male. She denied saying this testifying "I didn't know he was white. He looked Hispanic to me." Based on his appearance in court Rocha would be described by some as white and others as Hispanic. For what it is worth, I credit Ms. Cortes' recollection of what she said and Officer Deferville's recollection as flawed but, in the circumstances, of no material significance to the outcome of this motion.

There are other moments in the progression of the case that differ with the account given by Officer Deferville. Some police reports indicate that Rocha and the other man were leaving or had left the store when arrested. In a Grand Jury proceeding the investigating detective (who was not present at the arrest) was asked "Once they had assured themselves that they had their complete order, did Juan Rocha and Edward Thorn then take possession of the merchandise and

leave the store?" The detective answered "yes."[4] This report does not impeach Officer Deferville who made the arrest and never indicated that Rocha had left the store.

Essentially the police relied upon what they were told by Ms. Cortes. There was nothing they saw themselves that would justify an arrest. Rocha says that was not enough and the prosecution responds that police were entitled to rely upon the word of Ms. Cortes who was neither an anonymous nor a paid informant.

The general formula under *Aguilar-Spinelli* jurisprudence was that the word of a person who did not seek anonymity was generally reliable. Reliability of the speaker remains a circumstance to be considered under *Illinois v. Gates*. The question of whether the statements made established probable cause is another circumstance.

The significance of hearing information from an identified individual as a measure of reliability is well stated in *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986):

> The Supreme Court [formulae] do not suggest that an officer risks his career and his fortune by believing an apparently sober eyewitness to a crime. A 'prudent' officer may balk if the person claiming to be an eyewitness strolls into the police station and describes a crime from long ago, or if the person leveling the accusation is babbling or inconsistent.

---

[4]This exchange occurred in the State Grand Jury proceeding. It is, in my opinion, a reflection of an ancient legal artifact which arose as a result of a practice in some Illinois Circuit Courts of dismissing the occasional shoplifting charges on the theory (not supported in the Illinois Supreme or appellate courts, *see, e.g., People v. Baker*, 6 N.E.2d 665 (Ill. 1936); *People v. Hart*, 789 N.E.2d 905 (Ill. App. Ct. 2003); *City of Joliet v. Gregorec*, 299 N.E. 2d 356 (Ill. App. Ct. 1973)) that one is not guilty of shoplifting or theft from a store until the arrestee has crossed the threshold of the store. This erroneous local interpretation of state law (in most cases known by the judge to be legally incorrect) served the purpose of quickly disposing of low level cases particularly when the arrestee had already been punished and frightened after having spent a night or two in a lockup or a jail. The judges who ignored the law encouraged the police, in turn, to counter with their own act of ignoring the law.

*Id.* at 439.[5] In *Gramenos* the Court of Appeals cited, with favor, the language of *Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir. 1968) (when a police officer has "received his information from some person–normally the putative victim or an eye witness–it seems reasonable to believe he is telling the truth.")

Ms. Cortes was, as the hearing clearly established, sharp and sober. She had special training in the exercise of asset protection and represented the interests of the putative victim. In *Gramenos*, the police relied on a security guard at a supermarket. As Judge Easterbrook noted in that case, police act reasonably when relying on a security guard. This is because "the chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting." *Id.* A guard who "pursues a private agenda may be fired...The store will insist that guards err on the side of caution. It does not want to embarrass and anger an honest customer–not only because this is bad business but also because a false charge of crime may lead to costly tort litigation." *Id.* at 439. These observations, taken from a case of a small-time shoplifting case, have special force here where the customer was purchasing thousands of dollars worth of merchandise and the police knew this. Home Depot had every motivation not to make a false accusation.

---

[5]There is at least one case where a police officer accepted an accusation from a person I and everyone involved in the case believed to be patently deranged. The officer called the accused and required him to come to a police station to be processed. The prosecution dismissed the charge without requiring the presence of the accused but the police officer was able to claim that he performed some police activity on his otherwise exceptionally undisturbed watch.

The continuing authority of *Gramenos* is not in doubt. *See, e.g., Reynolds v. Jamison,* 488 F.3d 756 (7th Cir. 2007).[6]

Defendant cites cases in which Illinois courts have refused to find probable cause based on statements by witnesses or victims.[7] Yet none of these cases was decided on the premise that police should not have credited the statement of the person they relied upon. Rather those opinions asserted that the facts recited did not provide probable cause to arrest. In *Wilson*, the police knew only that a man had been robbed and the man's daughter, some days later, gave the victim the first names and addresses of the robbers which was, the Appellate Court said, "mere rumor or suspicion." A similar problem was noted in *Hollins,* where the witnesses had "learned" from others and conveyed this "learning" to the arresting officer. Finally, in *Garvin*, a witness reported that a stolen van had plates that had been stolen from him. The witness followed the van - which was itself accompanied by a white car - to a parking lot. Once there, the witness saw three men "in or around" the van.

This case does not suffer any of these defects. Ms.Cortes was trained in asset protection, held a responsible position at the store, and had information from other Home Depot investigators that a previous sale and delivery of expensive goods had been made at another store. There is no reason for the officers to question this information. The police had no reason to doubt the veracity of the report Ms. Cortes had received from her fellow workers in asset

---

[6]There was a partial dissent in *Reynolds* because the District Judge had denied discovery on what was said to the arresting officer to determine whether the officer's report was accurate. While civil discovery is not available in this criminal case, both the officer and the witness on whom he relied testified about what was said to the officer.

[7]*People v. Wilson*, 632 N.E.2d 114 (Ill. App. Ct. 1994), *People v. Hollins,* 523 N.E.2d 1309 (Ill. App. Ct. 1988) and *People v. Garvin,* 812 N.E.2d 773 (Ill. App. Ct. 2004).

protection. Finally, the prior pick-up of fraudulently secured goods was videotaped. Ms. Cortes had watched the video tape and, on the 29th, was able to identify Rocha and the other man as the same ones who took away the goods at the prior store. This is not mere rumor or learning, it is physical evidence upon which Ms. Cortes is permitted to rely and a valid reason for the officers to rely in turn on Ms. Cortes.

This case is further distinguishable from at least two (and, arguably, all three) of the cases cited by Rocha. The crimes in the other cases had been committed and the suspects had left the scene with their money or goods. Here, prompt police action had the potential to protect the property of the victim. Given the imminent acquisition of the goods, it seems unlikely that formal confirmation from Home Depot could be personally received by the officers in time to prevent further damage to Home Depot.

Defendant Rocha's motion to suppress evidence is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: February 15, 2011